Essex County Court of Common Pleas.

NICKOLAI BLAZIAK, PETITIONER-APPELLANT, v. EAST-WOOD-NEALLEY CORP., RESPONDENT-APPELLEE.

Decided February 24, 1948.

For the petitioner-appellant, *Joseph A. Fuerstman.*

For the respondent-appellee, *John W. Taylor.*

Hartshorne, C. P. J. This appeal lies from an award entered in the Bureau, reducing to 25% of total permanent disability a previous award to petitioner, Blaziak, of 50% of total permanent disability, "on the ground that the disa-

bility has diminished," *R. S.* 34:15-27; *N. J. S. A.* 34:15-27, subsequent to the making of the original award.

Counsel for Blaziak questions the legal validity of the present proceedings in certain aspects. Whether the proceedings to ascertain such subsequent change in disability—unknown to the common law, and of purely statutory origin—should be on formal petition, as in *Drake* v. *C. V. Hill Co.* (*Court of Errors and Appeals*), 117 *N. J. L.* 290; 187 *Atl. Rep.* 637, or on rule to show cause as here, would seem, in the absence of statutory specification, not to be jurisdictional, but merely procedural.

Similarly, the question of whether the application to diminish disability should be heard by the Commissioner who made the original award, or by another, would not seem jurisdictional either. On the other hand, and without any personal reflection whatever, there would seem to be sound reason why the Commissioner who heard the evidence, and entered the determination which fixed the basic disability, should also hear the subsequent evidence, and make the subsequent determination, as to whether such basic disability had been unexpectedly changed by lapse of time. The matter is not merely one of individual judicial comity. More important than that is the fact that the mind which made the original determination, and put its mere results in writing, has, in evaluating the testimony at the second hearing, the benefit of much which a new judicial mind lacks. The former, and not the latter, has seen and heard all the witnesses, the petitioner included, as they physically appeared and testified during the course of the first hearing. He is therefore in an unequaled position to pass on the credibility of their testimony, as to the claimed subsequent change in disability, as they—and most of them the same witnesses—testify at the second hearing. This is regardless of the waste of time and effort involved in seeking to acquaint a new mind with the full factual background, with which the Commissioner previously sitting is already fully acquainted. For analogous reasons other courts habitually adopt the same practice. For instance, the Court of Chancery requires an application for a modification of a stay to be made to the same Vice-Chan-

cellor who entered the original stay, and our courts of criminal jurisdiction regularly refer the sentence of a newly convicted defendant to the same judge who previously sentenced him for an earlier offense in the light of his character disabilities at that time. Though the procedure adopted in this case is not fatally defective, it is adverted to because of its importance to the wise administration of justice.

We turn to the facts. The original award was entered January 17th, 1946, as the result of an accident occurring November 17th, 1944, which was then determined to have resulted in the following specific injuries: to the left hand a disability of 65%, to the left shoulder 5%, and for a psychoneurosis 15%, the above aggregating a total permanent functional disability of 50%, as stated. These disabilities, as so determined, are the definite adjudicated base, from which is to be calculated the subsequent disability, on an application such as the present, either for increase or diminishment. *Drake* v. *C. V. Hill Co., supra; Tucker* v. *Beltramo,* 117 *N. J. L.* 72; 186 *Atl. Rep.* 821; 118 *N. J. L.* 301; 192 *Atl. Rep.* 62; *Watts* v. *Newark,* 25 *N. J. Mis. R.* 402; 54 *Atl. Rep. (2d)* 622. In addition to the present lengthy record on this second hearing of some 500 pages, we have the rather unusual exhibit of a series of motion pictures, taken of the petitioner, Blaziak, on three occasions, when he was clearly not aware of the purpose of their taking. Since "actions speak louder than words," both in law and in fact, the propriety and, if properly taken and projected, the helpfulness of these motion pictures, as evidence of the condition of the person or scene they portray, is undeniable. They permit the judge, as it were, to become a "jury of view," and of not the lifeless scene of the occasion in question, as is usually the case with such a jury, but of a portion of that very occasion itself—the disability of the person in question. The normal mode of taking such pictures—16 frames a second—and of projection at an equal speed, was duly proved. Indeed, the projection before this court was by an expert projectionist suggested by the court itself. Thus these moving pictures, of the petitioner himself, in action subsequent to the time of the original award, are of interest and importance. Three reels are shown, two of

which show him at work in his backyard, handling some light
lumber with both hands, picking up and holding nails with
his left hand, the disabled one, and hammering them with
his right hand in the course of some rather ordinary car-
pentry work. The third reel shows petitioner on a farm,
doing some farm work, and also carrying a bag of mash and
a small anvil a short distance to his house. These pictures
clearly indicate that, while the man can use both his left
hand and his left shoulder, which are claimed to have been
disabled, and in carpentry work, his previous profession, this
hand is by no means normal and of equal use with his right
in such work. For his left thumb is definitely stiff, and
several of the fingers of his left hand do not have the free
and full movement of those on the other hand. As to his
shoulder, while it does not prevent him from carrying this
bag of mash and small anvil, such pictures bring out one of
their own intrinsic limitations, *i. e.,* they show no more than
they show. Thus the carrying of the bag and anvil for but the
short distance portrayed, though without apparent difficulty
to the shoulder for such a brief period, by no means proves
that such weights could be carried for a much longer period
without distress. Nor does the brief carpentry work por-
trayed by the pictures, prove that such carpentry, even with
the disability indicated, could be carried on by the man for
the extended periods required of a regular carpenter. And
the verbal testimony raises a question as to this.

In addition to the above rather exceptional evidence, the
record further discloses that petitioner, in addition to being
a carpenter, had originally been a church organist and choir-
master as well, the which he was entirely prevented from
pursuing immediately after the accident. Then, in depar-
ture from this basic finding, the evidence at the present hear-
ing shows that, following the first determination in January
of 1946, he was re-employed to play an organ in certain
churches from May to Setpember of 1946, and from December
of 1946 to May of 1947. But, in the first place, he was en-
gaged to do this work only because the churches could not
get another organist, and, in the second place, he was dis-
charged from both positions because "the people were not

satisfied * * * with the playing;" obviously because his almost ankylosed thumb and several stiffened fingers on his left hand did not permit him to satisfactorily handle the organ manuals.

In short, while he is no longer completely disabled from acting as an organist and a carpenter, as he was at the time of the first, and basic, determination, he still has substantial disability in that regard.

Turning to the brief verbal testimony, supplementing the moving pictures, as to his farm work, we find the situation substantially the same. He was able to undertake it, but could not perform it as could an ordinary man.

By far the bulk of the written record is taken up with the medical evidence. On behalf of the employer, here the moving party, upon whom falls the burden of proving the alleged change in disability, appear Dr. Bohl, Dr. Eisenberg and Dr. Bergman. On behalf of the petitioner appear Dr. Ein, Dr. Gorten and Dr. Schwartzberg. As to the change in disability of the left hand, which it will be recalled was basically fixed at the first determination as 65% of that member, and which is the major disability, every one of the doctors who testify in that regard on both sides, with the exception of Dr. Schwartzberg, testifies there was a diminution of disability. Moreover, all of such doctors testify that this hand disability decreased, according to their own respective estimates, from 10 to 15%. This accords with the above lay testimony. It should be noted, however, that Dr. Schwartzberg, even after his attention was called to the findings on the first determination, did not clearly understand the binding effect of the legal principal above alluded to, to wit, that the original determination finally fixes, as of the time of its entry, the actual disability as there and then stated, and that it is from this fixed disability, as a base, that the present change is to be calculated. For Dr. Schwartzberg, who did not testify, as did the others, at the time of the first hearing, now fixes the hand disability at a figure greater than that fixed at the original hearing, and this in the face of all the other lay and medical testimony on both sides to the contrary. Of course it does not follow, simply because he did not testify

on the original hearing, that his testimony is now totally inadmissible, since, even though the issue at this time is the change from the original basic finding, nevertheless an estimate of present disability, if in fact different from the disability originally found, is corroborative evidence of a change. But that such testimony is much less likely to be helpful than that from a doctor who examined and testified on both occasions, is clearly shown in this very instance. The upshot is therefore clear that Blaziak's left hand has improved, on the doctors' estimates, some 15%, *i. e.,* to a 50% disability of the hand itself, the moving pictures, subject to their intrinsic limitations, indicating an even greater improvement.

Turning to the left shoulder, which is of less serious import, the medical testimony here is in dire conflict, some to the effect that there is presently no disability, and some to the effect that it or the neck is slightly worse than formerly. Here it must be borne in mind that the company's investigator who took the moving pictures, and who certainly would not be prone to color his recollection in petitioner's favor, admits that petitioner had a tremor in his arm when sawing. Since no brachial plexus was found to exist on the original hearing, this tremor would seem to indicate the continuance of some shoulder disability, despite the fact that same did not appear on the petitioner's carrying of the bag of mash and anvil for the short distance there involved. This disability, however, is not claimed to be great, and was originally fixed at but 5% for that location.

Finally, we come to the psychoneurosis, fixed at the original hearing at 15%, and testified to at the present hearing by Dr. Bergman, on the one hand, and Dr. Gorten, on the other. Dr. Gorten says this continues the same now as then. Dr. Bergman now considers it "minimal," *i. e.,* 5%. Here the moving pictures are important. For while they do not cover a long period of time, they do present a vivid picture of the man in his normal state, among his friends and family, and in the various types of occupation, either of carpentry or on the farm, that he would be most apt to undertake. In short, they show his functional state. Outside of the fact that these pictures, like the ordinary movies taken by the

average amateur, even at normal projection, somewhat speed up the action, for which the court of course makes allowance, there was nothing in these pictures of this man mingling with his friends or family, or doing odd jobs, including carpentry, either on the farm or around his home, which in anywise indicated him to be a real psychoneurotic. Both his psychoneurosis and left shoulder disability are therefore minimal at the present time.

. In conclusion, in order to determine petitioner's present disability, we must merge his various partial disabilities of the left hand, the left shoulder, and the alleged psychoneurosis, and consider him as a functional unit. Thus considered, there is no question but what his disability, fixed at the first hearing January 17th, 1946, at 50% of total permanent, has been substantially diminished. Looking at the moving pictures alone, the court would, without hesitation, say that a fair estimate of his present functional disability would be 25%. But bearing in mind the fact that these pictures throw little light on his capacity for continuous work, and bearing in mind the testimony, that he has real limitations in this regard, this court is of the opinion that petitioner's present disability has been diminished to the point where a fair award therefor is 35% of total permanent disability. A determination may be entered accordingly.